IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

**RODNEY D. VINSON,** )
)
      Plaintiff, )
)
v. ) **Civil No. 10-1034-CJP**
)
**MICHAEL J. ASTRUE**, )
**Commissioner of Social Security,** )
)
      Defendant. )

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Rodney D. Vinson is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying him Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI).[1]

## Procedural History

Mr. Vinson applied for benefits in November, 2007, alleging disability beginning on January 2, 2006. (Tr. 132, 135). The application was denied initially and on reconsideration. After holding a hearing, ALJ Joseph W. Warzycki denied the application for benefits in a decision dated November 5, 2009. (Tr. 12-24). Plaintiff's request for review was denied by the Appeals Council, and the decision of the ALJ became the final agency decision. (Tr. 1).

Administrative remedies have been exhausted and a timely complaint was filed in this Court.

---

[1]This case was referred to the undersigned for final disposition upon consent of the parties, pursuant to 28 U.S.C. §636(c). See, Doc. 20.

1

## Issues Raised by Plaintiff

Plaintiff argues that the ALJ erred in the following respects:

1.  He failed to include all of plaintiff's limitations in his assessment of residual functional capacity (RFC).

2.  He failed to adequately analyze whether plaintiff met Listing 12.05A, mental retardation.

3.  The ALJ's credibility analysis was erroneous.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[2] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).** A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C).** "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a

---

[2]The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. For all intents and purposes relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

claimant is disabled. It must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. **Schroeter v. Sullivan, 977 F.2d 391, 393 (7th Cir. 1992); see also, 20 C.F.R. §§ 404.1520(b-f).**

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. The scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**. Thus, this Court must determine not whether Mr. Vinson is, in fact, disabled, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. **See, Books v. Chater, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing *Diaz v. Chater*, **55 F.3d 300, 306 (7th Cir. 1995)**). This Court uses the Supreme Court's definition of substantial evidence, i.e, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." **Richardson v. Perales, 402 U.S. 389, 401 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. **Brewer v. Chater, 103 F.3d 1384, 1390 (7th Cir. 1997)**. However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, **Parker v. Astrue, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

## The Decision of the ALJ

ALJ Warzycki followed the five-step analytical framework described above. He determined that Mr. Vinson had not been engaged in substantial gainful activity since the alleged onset date, and that he had severe impairments of sickle cell disease with secondary priapism, chronic low back pain, left wrist osteoarthritis, depression and alcohol abuse. He further determined that these impairments do not meet or equal a listed impairment. The ALJ found that Mr. Vinson had the residual functional capacity to perform a limited range of work at the light exertional level. Based on the testimony of a vocational expert, the ALJ found that Mr. Vinson has the capacity to perform work such as housekeeper and cashier, both of which exist in significant numbers in the local and national economies.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff. Because Mr. Vinson does not challenge the ALJ's findings with respect to his physical condition, the Court will not describe that evidence.

**1. Agency Forms**

Mr. Vinson was born in 1968, and was 37 years old when he allegedly became disabled. He was last insured for DIB as of December 31, 2010. (Tr. 175). He stopped working on January 2, 2006, due to a broken left hand and learning disability. (Tr. 180). He worked as a janitor from 1996 through 2005. He cleaned offices and a medical building. (Tr. 181).

Plaintiff's cousin Anquinette White completed a report in which she stated that plaintiff had no problems with personal care such as bathing and dressing. She said he helps clean the kitchen and rake the yard. He is able to go out alone, but does not drive. He is able to pay bills,

but could not use a checkbook because he cannot read or write. He is able to follow spoken instructions. He can pay attention for 1 hour. He handles stress badly. (Tr. 195-202). She also indicated that he cleans his bedroom and vacuums. He cannot lift anything heavy. (Tr. 208).

Ms. White also indicated that plaintiff suffered a brain injury when he was hit by a car at the age of four. (Tr. 225).

**2.    Evidentiary Hearing**

Plaintiff was represented by an attorney at the evidentiary hearing on July 23, 2009. (Tr. 33).

He went to the eighth grade in special education classes. He can read and write a little. (Tr. 37-38). From 1996 to 2005, plaintiff worked as a janitor. He said that he wiped off desks and took out trash. He worked with his cousin. (Tr. 42).

Plaintiff indicated that his hand and back were "bothering [him] real bad" on the alleged date of disability. He had been in a car accident, but did not know when that occurred. (Tr. 41).

Mr. Vinson lived with his cousin at the time of the hearing. (Tr. 35). Plaintiff's cousin cooks his meals. He watches television a lot. He does not do any reading. Sometimes he goes outside and talks to the neighbors. (Tr. 43-44). His cousin takes care of him. (Tr. 46). He is able to take a bath or shower. (Tr. 47). He testified that he did not smoke, drink, or do drugs. (Tr. 47).

He takes medicine to keep his temper down. He takes Lexapro for his nerves. (Tr. 48). He denied side effects from his medications. (Tr. 50). He was hospitalized once after a suicide attempt. (Tr. 50). At the time of the hearing, he was seeing Dr. Raza for psychiatric care. (Tr. 50).

The ALJ stated that plaintiff's cousin completed a form in which she indicated that

plaintiff rakes the yard, pays his own bills, is able to count change, and can walk 6 blocks. Plaintiff testified that this was not true and he did not know why she wrote that. (Tr. 51).

Plaintiff testified that, in addition to the head injury he suffered as a child, he was hit in the head by a bat sometime in the 1990s. He had some kind of surgery. (Tr. 57-58).

The ALJ noted that there were indications in the medical records of alcohol abuse. Plaintiff again stated that he did not drink. (Tr. 58-59).

Vincent Stock testified as a vocational expert. The ALJ asked the VE to assume a person with a limited education who could do light work, limited to no ladders, ropes or scaffolds, only simple repetitive tasks and instructions, and only occasional use of the left upper extremity for fine and gross manipulations. The VE testified that this person would be able to do plaintiff's past work as he had performed it, but not as it is generally performed. However, this person would be able to do other jobs such as housekeeping and cashier. Both jobs exist in significant numbers in the regional and national economies. (Tr. 61-62).

The ALJ then added the assumption that the person had cognitive and intentional[3] skills adequate for simple one-to-two step tasks, was able to carry out a fair range of daily activities, had symptoms of anxiety, was moderately limited in ability to manage detailed tasks, and had interpersonal skills and adaptive skills within normal limits. The VE testified that this person could do the housekeeping and cashier jobs. (Tr. 63).

At the end of the hearing, the ALJ stated that he would obtain a psychological examination with IQ testing, as well as a physical examination due to the diagnosis of sickle cell anemia. (Tr. 63).

---

[3]The transcript says "intentional," but the ALJ most likely said "attentional."

### 3. Medical Records

The earliest medical record is dated January 16, 2007. On that date, plaintiff went to the emergency room at Kenneth Hall Regional Hospital complaining of headaches with vomiting for the past two months. (Tr. 268-282).

Plaintiff began seeing Dr. S.A. Raza for psychiatric treatment on January 22, 2008. He complained of having a depressed mood with crying spells, feelings of hopelessness and helplessness, along with thoughts of hurting himself. He gave a past history of brain damage as a child resulting from being hit by a car. He had broken his hand at work two years earlier, which was treated with surgery and therapy. He had a history of alcohol dependence for which he had received outpatient treatment. He said that he last drank a week ago, and that he drank once a week. On exam, his thought and talk were coherent and relevant, and his thought process was rational. He was alert and oriented, but his mood was depressed. His insight and judgment were impaired. The Axis I diagnoses were major depressive disorder and alcohol abuse. Dr. Raza recommended a neurological evaluation, medication and counseling. (Tr. 326-327).

On February 16, 2008, Harry J. Deppe, Ph.D., performed a consultative psychological examination of Mr. Vinson. Mr. Vinson told Dr. Deppe that he was seeking disability because he had a head injury at the age of four, and now his left wrist hurt. He said that he only went to the eighth grade in school and was a slow learner. He said he had never had any problems with drugs or alcohol. He was taking Lexapro, which had been prescribed by Dr. Raza. Dr. Deppe administered the Wechsler Adult Intelligence Scale-III, which resulted in a full scale IQ score of 45. However, Dr. Deppe noted that Mr. Vinson answered "I don't know" to every question. This contrasted with his ability to answer questions about his personal history, which he was able to do with little effort. Dr. Deppe concluded that the testing was not accurate due to

7

plaintiff's "obvious lack of effort." (Tr. 285-286). Dr. Deppe's assessment was that plaintiff had intact ability to relate to others, and fair ability to understand simple instructions, maintain attention required to perform simple, repetitive tasks, and to withstand the stress associated with work. His general prognosis was fair. (Tr. 286).

Mr. Vinson continued to see Dr. Raza. On March 25, 2008, Dr. Raza noted that he was doing better on Lexapro and that he had quit drinking. (Tr. 318). On April 22, 2008, Dr. Raza increased the dosage of Lexapro because plaintiff exhibited regressed behavior and was talking to his dead father at night. (Tr. 317). On June 9, 2008, plaintiff reported to Dr. Raza that he had been arrested for failure to pay child support and had spent a month in jail. He did not have his medication during that time. He was hearing voices telling him to kill himself. Dr. Raza's diagnoses were major depressive disorder, psychotic and alcohol abuse. He recommended hospitalization. (Tr. 314).

Plaintiff was admitted to Kenneth Hall Regional Hospital on June 9, 2008. The transcript contains only a History and Physical Examination note that was dictated on June 11, 2008, and some lab results. The note describes Mr. Vinson as " a highly distractible, borderline manic patient." (Tr. 328-329).

Dr. Raza saw plaintiff in his office on June 24, 2008, and noted that plaintiff had been discharged from the hospital on June 13, 2008. Mr. Vinson did not know the name of the psychiatrist who treated him in the hospital, or the name of the medication that he had been given. He said that the medication helped him calm down. Dr. Raza noted that he was coherent, rational, alert and oriented, but his insight and judgment were poor. The diagnoses were major depressive disorder and alcohol abuse. (Tr. 342). One month later, Dr. Raza noted that there was a "noticeable improvement" in the way Mr. Vinson looked and felt. (Tr. 341).

On August 26, 2008, Dr. Raza completed a form in which he assessed plaintiff's ability to work. He rated Mr. Vinson's ability as "poor to none" in a number of areas, including maintaining attention and concentration, dealing with work stressors, and behaving in an emotionally stable manner. He rated his ability to understand, remember and carry out simple instructions as fair. Dr. Raza wrote that Mr. Vinson had inadequate ability to cope with the stresses of a job as a result of a number of factors, including brain damage, severe depression and "longstanding exposure to alcohol." He also wrote that any stress causes him to regress and become suicidal, psychotic, or totally dependant and unable to make decisions. (Tr. 339-340).

Plaintiff next saw Dr. Raza in March, 2009. He was not psychotic, and was alert and oriented. He had been taking Trazodone for his depression. Dr. Raza changed his medication to Invega and Lexapro due to possible side effects of Trazodone. (Tr. 427). On May 28, 2009, Dr. Raza noted that he was feeling "much better" and his depression had subsided. (Tr. 425).

Dr. Raza wrote a note dated August 4, 2009, in which he stated that Mr. Vinson had shown improvement on Invega and Lexapro, and had also been abstaining from alcohol. However, as of July, 2009, the clinic changed its policy on treating uninsured patients, which meant that Dr. Raza could no longer see Mr. Vinson. Dr. Raza wrote that Mr. Vinson had no insurance and was unable to afford his medication, and he had to substitute "inexpensive generic drugs" for Invega and Lexapro. He wrote that it remains to be seen whether he would "maintain his improvement or slide back into regression." (Tr. 429).

Dr. Deppe did another consultative psychological examination on August 29, 2009. Dr. Deppe had reviewed some of Dr. Raza's treatment notes. Mr. Vinson told Dr. Deppe that he had never been treated for problems associated with alcohol use. When Dr. Deppe told him that this was not consistent with Dr. Raza's notes, Mr. Vinson said, "I don't know anything about that."

9

Mr. Vinson was still taking medication prescribed by Dr. Raza, and was taking Vicodin for his sickle cell anemia. On examination, plaintiff's mood was within normal limits. He made a fair effort to answer questions, but was "somewhat vague" regarding his alcohol use and employment history. Mr. Vinson said he no longer heard voices. He was oriented to time, place and person. His fund of general knowledge was good. His memory for recent and more remote events was "fair at best." His immediate memory skills were fair. Dr. Deppe could not assess his abstract reasoning skills or ability to do simple calculations because he refused to try to answer those questions. With regard to his work history, Mr. Vinson said he had to quit his janitorial job because he hurt his hand. He said he spent his time seeing friends. He said that he functioned independently in terms of bathing and dressing himself. Dr. Deppe's assessment was that plaintiff had intact ability to relate to others, and fair ability to understand simple instructions, maintain attention required to perform simple, repetitive tasks, and to withstand the stress associated with work. His general prognosis was fair. (Tr. 432-426).

**4.    RFC Assessment**

On March 10, 2008, state agency consultant Margaret Wharton completed an assessment of plaintiff's mental residual functional capacity. She indicated that Mr. Vinson was not significantly limited in every area of mental functioning except three. She rated Mr. Vinson as moderately limited in ability to understand and remember detailed instructions, carry out detailed instructions, and maintain attention and concentration for extended periods. She wrote that plaintiff's cognitive and attentional skills were adequate for simple one-two step work tasks. (Tr. 297-300).

## Analysis

For his first point, plaintiff takes issue with the ALJ's assessment of his RFC. Plaintiff

argues that the ALJ failed to include all limitations that were established by the record.

The only mental limitation accepted by the ALJ was that plaintiff is limited to simple, repetitive work. See, Tr. 16. There is conflicting evidence about the presence of most of the limitations that plaintiff says should have been included. He argues, in essence, that the ALJ should have accepted the severe restrictions assessed by Dr. Raza in his report of August 26, 2008.

The ALJ gave "limited weight" to Dr. Raza's assessment because it conflicted with his own treatment notes. (Tr. 21). A treating physician's opinion is not automatically entitled to controlling weight. Such an opinion is entitled to controlling weight only where it is supported by medical findings and is not inconsistent with other substantial evidence in the record. ***Clifford v. Apfel*, 227 F.3d 863 (7th Cir. 2000); *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001).** Further, to the extent that plaintiff is arguing that the ALJ was bound to accept his treating physician's opinion as to his RFC, he is mistaken. SSR96-8p instructs that the "RFC assessment must be based on *all* of the relevant evidence in the case record," including medical history, medical signs and laboratory findings, effects of treatment, reports of daily activities, lay evidence, medical source statements, etc. SSR96-8p, at *5 (emphasis in original). Opinions of treating doctors regarding RFC are *not* given any special weight because the issue of RFC is an issue that is reserved to the Commissioner. See, 20 C.F.R. §416.927(e).

That being said, plaintiff does have a meritorious point regarding his limited ability to read and write. The ALJ did not make a specific finding about plaintiff's literacy level, although he noted Mr. Vinson's testimony that he went to the eighth grade in special education classes and could "barely read or write." (Tr. 19). In his hypothetical question to the VE, the ALJ asked him to assume a person with "a limited education." He did not define "limited education"

or ask the VE to make any specific assumption about ability to read and write. (Tr. 61).

The applicable regulation defines a limited education as "ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs." 20 C.F.R. §404.1564(b)(3). The agency generally considers that a "7th grade through the 11th grade level of formal education is a limited education. " *Ibid*. Illiteracy is defined in the same regulation. Pursuant to 20 C.F.R. §404.1564(b)(1), the agency considers a person to be illiterate "if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal schooling." There is another level between illiteracy and limited education; marginal education is "ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs." 20 C.F.R. §404.1564(b)(2). The agency generally considers "formal schooling at a 6th grade level or less" to be a marginal education. *Ibid*. Here, plaintiff went to the eighth grade, but he was in special education classes.

Based on the VE's testimony, the ALJ found that Mr. Vinson could do the jobs of housekeeper and cashier, which are light and unskilled. In response to a question from plaintiff's counsel about the reading ability required for those jobs, the VE testified that the job of housekeeper is at L1 and the job of cashier is at L2. (Tr. 63). These are references to standards set out in the *Dictionary of Occupational Titles*. The VE testified that his opinions were consistent with the information in the *DOT*. (Tr. 62).

According to the *DOT*, the housekeeping job described by the VE has the following requirements:

> Reading: Recognize meaning of 2,500 (two- or three-syllable) words.

12

> Read at rate of 95-120 words per minute. Compare similarities and differences between words and between series of numbers.
>
> Writing: Print simple sentences containing subject, verb, and object, and series of numbers, names, and addresses.

*Dictionary of Occupational Titles, Cleaner, Housekeeping, 323.687-014.*

The requirements of the cashier job described by the VE are as follows:

> Reading: Passive vocabulary of 5,000-6,000 words. Read at rate of 190-215 words per minute. Read adventure stories and comic books, looking up unfamiliar words in dictionary for meaning, spelling, and pronunciation. Read instructions for assembling model cars and airplanes.
>
> Writing: Write compound and complex sentences, using cursive style, proper end punctuation, and employing adjectives and adverbs.

*Dictionary of Occupational Titles, Cashier II, 211.462-010.*

According to the plaintiff's testimony, he was able to read and write only simple words such as stop, go, cat and dog. He said he could not read a newspaper. (Tr. 54). No one asked the VE whether a person with plaintiff's limited ability to read and write could do the jobs of cashier and housekeeper. However, if plaintiff's ability to read and write is as limited as he said it was, it seems doubtful that he could do either of these jobs as they are described in the *DOT*.

As is noted above, the ALJ did not make any specific statement as to whether he believed plaintiff's testimony about his ability to read and write. However, he did not cite to any evidence in the record to cast doubt on that testimony. The ALJ did not cite to any support in the record for the assumption that plaintiff had a limited education. If the ALJ accepted plaintiff's testimony about his ability to read and write, it was error not to factor that limitation into his analysis by including it in the hypothetical question posed to the VE. The ALJ must give the VE "a complete picture of a claimant's residual functional capacity" by including in the hypothetical question all physical and mental limitations which he finds to be credible. ***Jelinek v. Astrue,***

**662 F.3d 805, 813-814 (7th Cir. 2011).**

This is not to say that plaintiff is automatically entitled to benefits if he is unable to read and write at the levels described in the above job descriptions. It is possible that, had the limitation been included in the hypothetical question, the VE might have testified that plaintiff could still perform the jobs of cashier and housekeeper. The Seventh Circuit has noted that the *DOT* considers that basic literacy is "essential *for every job in the economy*" even though many people who cannot read are nevertheless able to find work. **Donahue v. Barnhart, 279 F.3d 441, 445-446 (7th Cir. 2002)(emphasis in original).**

If, on the other hand, the ALJ did not believe plaintiff's ability to read and write was as limited as he said it was, the ALJ erred in failing to explain the basis for that finding. "The ALJ is not required to discuss every piece of evidence, but must build a logical bridge from evidence to conclusion." *Vilano v. Astrue,* **556 F.3d 558, 562 (7th Cir. 2009), and cases cited therein.**

The failure to make a finding regarding Mr. Vinson's ability to read and write implicates plaintiff's third point. The ALJ's credibility finding was lacking. He used the "meaningless boilerplate" language criticized in cases such as **Parker v. Astrue, 597 F.3d 920, 921-922 (7th Cir. 2010)** and **Brindisi v. Barnhart, 315 F.3d 783, 787-788 (7th Cir. 2003)**. As in *Parker*, the ALJ's statement is meaningless because it does not communicate what weight he actually gave the testimony.

It is also problematic that the ALJ rejected plaintiff's testimony to the extent that it did not mesh with his findings as to RFC. This approach "turns the credibility determination process on its head by finding statements that support the ruling credible and rejecting those statements that do not, rather than evaluating the [claimant's] credibility as an initial matter in order to come to a decision on the merits." **Brindisi v. Barnhart, 315 F.3d 783, 787-788 (7th Cir. 2003)**.

14

The ALJ's use of the boilerplate language is not necessarily fatal. The ALJ's decision might pass muster had he gone on to support his credibility findings with a sufficient articulation of how the record contradicts the claimant's statements. ALJ Warzycki did not do so here. In fact, the ALJ misconstrued the record regarding alcohol abuse.

The ALJ based his credibility determination, in part, on his perception that plaintiff's testimony about alcohol use was contradicted by the medical records. See, Tr. 20-21.

At the hearing on July 23, 2009, the ALJ posed questions about alcohol use to plaintiff in the present tense. See, Tr. 47, 58-59. The plaintiff responded in the negative, saying "I don't drink at all, sir" and "I don't drink." (Tr. 59). The ALJ did not, however, question plaintiff about past use or past treatment for alcohol abuse.

The records do not indicate that plaintiff was drinking alcohol around the time of the hearing. In fact, Dr. Raza wrote a note on August 4, 2009, in which he said that plaintiff had "abstained from alcohol." (Tr. 429). The ALJ failed to note this evidence. The ALJ must "confront evidence that does not support his conclusion and explain why it was rejected." ***Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004).** The ALJ's incorrect conclusion that plaintiff's testimony about alcohol use was contradicted by the medical records undermines the credibility findings.

Lastly, the Court notes that plaintiff's second point regarding Listing 12.05A is completely without merit. A finding that a claimant's condition meets or equals a listed impairment is a finding that the claimant is presumptively disabled. In order to be found presumptively disabled, the claimant must meet *all* of the criteria in the listing; an impairment "cannot meet the criteria of a listing based only on a diagnosis." 20 C.F.R. §404.1525(d). Plaintiff bears the burden of proving that he meets or equals a listed impairment. ***Ribaudo v.***

15

*Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006); *Maggard v. Apfel,* 167 F.3d 376, 380 (7th Cir. 1999). He has completely failed to do so here.

One of the criteria of Listing 12.05A is mental incapacity "evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing)." The medical records and plaintiff's own testimony establish that he was independent in caring for his personal needs. It is not error to fail to discuss a listing where there is no evidence that the listing was met. *Scheck v. Barnhart*, 357 F.3d 697, 700-701 (7th Cir. 2004).

Because of the ALJ's errors, this case must be remanded. The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Mr. Vinson is disabled or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

It is therefore **ORDERED** that the Commissioner's final decision denying Rodney D. Vinson's application for social security disability benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of **42 U.S.C. §405(g).**

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATED: February 24, 2012.**

                    **s/ Clifford J. Proud**
                    **CLIFFORD J. PROUD**
                    **United States Magistrate Judge**